UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL LIABILITY & FIRE INSURANCE COMPANY, | : | CIVIL NO. 3:22-CV-780 |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| SNAPMEDTECH, INC., | : | |
| | : | JUNE 16, 2022 |
| Defendant. | : | |

# COMPLAINT

Plaintiff, National Liability & Fire Insurance Company ("NL&F"), by and through undersigned counsel, as and for its Complaint against Defendant, SnapMedTech, Inc. ("SnapMed"), alleges as follows:

## NATURE OF THE ACTION

1. In this action, NL&F seeks damages and declaratory relief based on SnapMed's breaches of contract, negligent and/or innocent misrepresentations, and violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110a et seq, ("CUTPA").

## PARTIES

2. Plaintiff National Liability & Fire Insurance Company is a corporation organized under the laws of the state of Connecticut, with its principal place of business in Connecticut.

3. Defendant SnapMedTech, Inc. is a corporation organized under the laws of the state of Delaware. Upon information and belief, SnapMed's principal place of business is in the state of Georgia.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiff is of diverse citizenship from the Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has personal jurisdiction over SnapMedTech because SnapMedTech is registered to do business in Connecticut and has knowingly conducted business with a Connecticut corporation by entering into an insurance contract that was made and to be performed in Connecticut, as provided in Conn. Gen. Stat. § 33-929(f)(1).

6. This Court also has personal jurisdiction over SnapMedTech because SnapMedTech has committed tortious conduct directed toward NL&F in Connecticut, as provided in Conn. Gen. Stat. § 33-929(f)(4).

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this Court has personal jurisdiction over SnapMedTech with respect to this action.

**FACTS COMMON TO ALL COUNTS FOR RELIEF**

8. SnapMed is a staffing agency. It provides a technology platform that connects healthcare professionals with facilities that have immediate and long-term staffing needs. SnapMed employs healthcare professionals and places them with hospitals and other healthcare facilities to fill immediate and long-term staffing needs. For example, through its "SnapNurse" platform, SnapMed offers facilities the ability to deliver fully-accredited staff in "just 2-3 days."

9. Upon information and belief, as a result of the Covid-19 pandemic, SnapMed experienced extraordinary growth, significantly expanding the pool of healthcare professionals it employs to meet the needs of its clients and increasing its revenues by 77,000 % in 2020.

**The 2020 Policy**

10. SnapMed applied to NL&F to provide workers compensation and employment liability insurance. From its offices in Stamford, Connecticut, NL&F issued a Workers Compensation and Employers Liability Insurance Policy, bearing number V9WC163779, to SnapMed, effective for the period March 9, 2020 to March 9, 2021 ("2020 Policy").

11. In exchange for the coverage that the 2020 Policy provides, SnapMed agreed to pay insurance premiums to NL&F.

12. The 2020 Policy required SnapMed to pay a total estimated annual premium, in installments that were due in NL&F's offices in Stamford, Connecticut on specified dates.

13. The total estimated annual premium was based upon certain information that SnapMed provided to NL&F, including the estimated size of SnapMed's payroll for each applicable state and job classification. The total estimated premium shown on the Information Page of the 2020 Policy is $53,845.

14. The 2020 Policy further provided for SnapMed to pay a final premium to be determined after the policy ends "by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium [SnapMed] paid to us, [SnapMed] must pay us the balance."

15. The 2020 Policy required that SnapMed "will keep records of information needed to compute premium. [SnapMed] will provide [NL&F] with copies of those records when [NL&F] ask[s] for them."

16. The 2020 Policy also required SnapMed to allow NL&F to "examine and audit all [SnapMed's] records that relate to this policy . . . during regular business hours during the policy period and within three years after the policy period ends."

17. The 2020 Policy specifically provided that "[i]nformation developed by audit will be used to determine final premium."

18. Moreover, the 2020 Policy specified that the records subject to audit "include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data."

19. The 2020 Policy initially covered work in only Georgia, Nevada, and California.

20. Between April 2020 and October 2020, however, NL&F endorsed the 2020 Policy numerous times at SnapMed's request to add new locations in various states.

21. The various endorsements added coverage to new SnapMed locations in Arizona, Delaware, Florida, Illinois, Kansas, Massachusetts, Maryland, Michigan, Mississippi, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia for additional premiums based on estimates that SnapMed provided of its exposure basis, including payroll, in the added locations.

**SnapMed Applies to Renew Its Coverage**

22. On or around January 28, 2021 and before the 2020 Policy expired, SnapMed applied to renew its workers compensation and employers liability coverage with NL&F.

23. In its application dated January 28, 2021 (the "January Application"), SnapMed sought workers compensation and employers liability coverage from NL&F in twenty states.

24. For each state in which it sought coverage, SnapMed provided an "estimated annual remuneration/payroll."

25. Upon information and belief, SnapMed provided NL&F with false and/or inaccurate information concerning its total estimated annual payroll.

26. In its application, SnapMed estimated a total annual payroll for all states of approximately $109.6 million.

27. A later audit, completed in January 2022, however, revealed that SnapMed's payroll from the period of March 9, 2021 to April 1, 2021 alone was approximately $55.4 million, more than half of its total estimated annual payroll.

28. Moreover, upon information and belief, SnapMed provided false and/or inaccurate information regarding the estimated annual payroll for some of the individual states for which it sought coverage.

29. For example, in the January Application, SnapMed estimated that its annual payroll for California would be approximately $5.5 million.

30. As the January 2022 audit determined, however, SnapMed's payroll from the period of March 9, 2021 to April 1, 2021 for California was approximately $43.8 million, approximately eight times more than the estimated annual payroll for California that SnapMed provided in the January Application.

31. Upon information and belief, SnapMed's estimation of its annual payroll for all states that it provided in the January Application also was inconsistent with information that SnapMed provided in its quarterly federal tax returns.

32. SnapMed reported a total payroll of $159,922.08 for January, February, and March of 2020 in its quarterly tax return for that period.

33. SnapMed reported a total payroll of $2,494,485.71 for April, May, and June of 2020 in its quarterly federal tax return for that period.

34. SnapMed reported a total payroll of $20,401,848.97 for July, August, and September of 2020 in its quarterly tax return for that period.

35. SnapMed reported a total payroll of $22,741,961.64 for October, November, and December of 2020 ("Q4 2020") in its quarterly tax return for that period.

36. SnapMed reported a total payroll of $216,009,590.76 for January, February, and March of 2021 ("Q1 2021") in its quarterly tax return for that period.

37. SnapMed reported a total payroll of $125,174,273.51 for April, May, and June of 2021 in its quarterly tax return for that period.

38. Upon information and belief, as a result of the huge jump in payroll between Q4 2020 and Q1 2021, SnapMed knew that its business was increasing exponentially and should have known that the estimated payroll figures it provided in the January Application were false and/or inaccurate.

**The 2021 "Stub" Policy**

39. On March 2, 2021, NL&F prepared a Proposal of Insurance and indicated that it was interested in renewing coverage for SnapMed.

40. In the Proposal of Insurance, NL&F relied upon the estimated annual payroll figures reported in SnapMed's January Application to calculate the estimated annual premium.

41. From its offices in Connecticut, NL&F issued a Workers Compensation and Employers Liability Insurance Policy, bearing number V9WC224917, to SnapMed, with a policy period to run from March 9, 2021 to March 9, 2022 ("2021 Stub Policy").

42. Like the 2020 Policy, the 2021 Stub Policy also provided for SnapMed to pay a total estimated annual premium and then, following an audit, a final premium.

43. Upon information and belief, SnapMed obtained alternative workers compensation and employer liability insurance to be effective April 1, 2021.

44. It was not until after April 1, 2021, however, that SnapMed informed NL&F about the alternative coverage.

45. NL&F canceled the 2021 Stub Policy effective May 17, 2021, because the "risk originally accepted [had] measurably increased." Subsequently, at SnapMed's request and upon learning of the alternative coverage that SnapMed had acquired, NL&F agreed to cancel the 2021 Stub Policy effective April 1, 2021.

**The 2020 Policy Audit**

46. On or around February 23, 2021, NL&F sent a letter to SnapMed regarding the premium audit for the 2020 Policy.

47. The letter informed SnapMed that the 2020 Policy was about to expire and that an audit must be performed to determine the actual cost of SnapMed's coverage.

48. The letter further informed SnapMed that NL&F had retained a third-party auditor, RLD Associates, to perform the audit and that an auditor would be contacting SnapMed to schedule an appointment.

49. The letter also asked SnapMed to prepare for the audit by gathering the relevant information including payroll records and Federal Quarterly Tax Returns.

50. From March 2021 to September 2021, an auditor from RLD Associates worked with SnapMed to complete the audit on the 2020 Policy.

51. SnapMed failed to cooperate fully with the audit on the 2020 Policy, however.

52. The audit on the 2020 Policy eventually was returned as unproductive because "[a]ccess to the required financial records (2020), Federal income tax return-Form 1120S, payroll records, general ledger, (profit and loss statement) [had] not been provided."

**The 2021 Stub Policy Audit**

53. On May 19, 2021, NL&F sent a letter to SnapMed regarding a premium audit for the 2021 Stub Policy.

54. The letter informed SnapMed that the 2021 Stub Policy was about to expire and that a third-party auditor, Premium Audit Consultants, had been retained to conduct the audit to determine the actual cost of coverage.

55. SnapMed complied with the audit for the 2021 Stub Policy.

56. The audit determined that SnapMed had over $150 million in payroll for the period of March 9, 2021 to May 17, 2021.

57. The audit also indicated that SnapMed owed upwards of $4 million in additional premium for the 2021 Stub Policy through May 17, 2021.

**SnapMed Refuses to Cooperate with Additional Audits of the Policies**

58. In November 2021, SnapMed sent a letter to NL&F formally disputing the audit of the 2021 Stub Policy.

59. SnapMed disputed both the termination date of the 2021 Stub Policy and the classification of certain employees in three states.

60. In regard to the termination date of the 2021 Stub Policy, SnapMed claimed that the period from March 9, 2021 to May 17, 2021 was incorrect because it had obtained workers compensation policies with another insurer, effective April 1, 2021 at 12:01 a.m.

61. In response to SnapMed's audit dispute letter, NL&F changed the effective date of the 2021 Stub Policy's cancellation to April 1, 2021.

62. NL&F advised SnapMed that the audit on the 2020 Policy still needed to be completed.

63. NL&F also informed SnapMed that NL&F would adjust the payroll for the audit of the 2021 Stub Policy to reflect the new cancellation date and that it would address SnapMed's classification dispute.

64. NL&F further advised SnapMed that to complete these audits, SnapMed would need to cooperate with the auditor and provide them with the necessary information that the auditor requested.

65. On or around November 19, 2021, NL&F retained Premium Audit Consultants to complete the audit on the 2020 Policy and to complete a revised audit for the 2021 Stub Policy.

66. SnapMed failed to provide the requested information for the audits of both policies.

67. As a result of SnapMed's non-responsiveness to requests for information, the audit for the 2020 Policy could not be completed.

68. Unable to complete the audit for the 2020 Policy because of SnapMed's failure to cooperate, NL&F has estimated the total premium for the 2020 Policy.

69. In making this estimate, NL&F used information available to it, including the information that SnapMed submitted in connection with the 2021 Stub Policy audit.

70. NL&F, as described above, estimates that the total premium for the 2020 Policy is approximately $4.2 million.

71. Until SnapMed fully complies with the audit for the 2020 Policy, however, NL&F cannot determine the actual final premium.

72. On January 10, 2022, a revised audit for the 2021 Stub Policy was completed.

73. The final premium for the 2021 Stub Policy through the April 1, 2021 cancellation was determined to be $1,509,397.

74. To date, despite numerous requests for cooperation, SnapMed has failed to provide the necessary documentation that will allow the audit on the 2020 Policy to be completed.

75. To date, SnapMed also has failed to pay the entire premium for the 2021 Stub Policy.

76. To date, SnapMed has issued only one payment of $109,240 for the 2021 Stub Policy, leaving a balance due for that policy of $1,400,157.

## **FIRST COUNT – BREACH OF THE 2020 POLICY**

1-76. Plaintiff repeats and re-alleges paragraphs 1-76 above as if fully set forth herein.

77. In accordance with the terms of the 2020 Policy, SnapMed was required to pay a premium to NL&F in exchange for the workers compensation and employers liability coverage.

78. Pursuant to the terms of the 2020 Policy, SnapMed also was required to comply with an audit to determine the final premium for the 2020 Policy.

79. NL&F has fully performed its obligations under the 2020 Policy.

80. Notwithstanding NL&F's performance of its duties, SnapMed failed to comply with the audit for the 2020 Policy, in breach of its obligations.

81. In failing to cooperate with the audit, SnapMed has breached the 2020 Policy.

82. In addition, upon information and belief, a comprehensive and completed audit would reveal that the final premium for the 2020 Policy is significantly larger than the premiums that SnapMed has paid to date.

-10-

83. Upon information and belief, based on the information that SnapMed previously had submitted to NL&F, the total premium for the 2020 Policy is an estimated $4.2 million.

84. As a result of SnapMed's breach, NL&F has suffered and continues to suffer damages. NL&F will be unable to determine the full extent of its damages for SnapMed's breach of the 2020 Policy until an audit of the 2020 Policy is complete, thus revealing how much SnapMed owes NL&F in premiums.

### SECOND COUNT – BREACH OF THE 2021 STUB POLICY

1-84. Plaintiff repeats and re-alleges paragraphs 1-84 above as if fully set forth herein.

85. In accordance with the terms of the 2021 Stub Policy, SnapMed was required to pay a premium to NL&F in exchange for the workers compensation and employers liability coverage.

86. SnapMed also was required to comply with an audit to determine the final premium for the 2021 Stub Policy

87. NL&F has performed its obligations under the 2021 Stub Policy.

88. Following the audit of the 2021 Stub Policy, SnapMed has failed to pay the final premium for the 2021 Stub Policy in full, in breach of its obligations under the policy.

89. As a result of SnapMed's breach of the 2021 Stub Policy, NL&F has been damaged in the amount of not less than $1,400,157.

### THIRD COUNT – DECLARATORY JUDGMENT WITH RESPECT TO AUDIT

1-89. Plaintiff repeats and re-alleges paragraphs 1-89 above as if fully set forth herein.

90. NL&F has repeatedly requested that SnapMed allow it to conduct an audit on the 2020 Policy in accordance with the terms of the 2020 Policy.

91. In breach of its obligations under the 2020 Policy, SnapMed has not cooperated with NL&F's attempts to conduct that audit.

92. By failing to cooperate with NL&F's attempts to conduct an audit of the 2020 Policy, SnapMed has prevented NL&F from determining the final premium, and thus any additional premium due from SnapMed.

93. NL&F is entitled to a declaration pursuant to 28 U.S.C. § 2201(a) that SnapMed is required under the 2020 Policy to permit NL&F to audit its books and records that relate to the policy, and required to pay NL&F any additional premium due as a result of that audit.

### FOURTH COUNT – NEGLIGENT MISREPRESENTATION

1-93. Plaintiff repeats and re-alleges paragraphs 1-93 as if fully set forth herein.

94. In connection with its January Application for the 2021 Stub Policy, SnapMed provided NL&F with payroll estimates for each of the states in which it operated.

95. Upon information and belief, SnapMed negligently misrepresented these estimates, as the actual total payroll across all states for the period of March 9, 2021 to April 1, 2021 was approximately $55.4 million, more than half of its total estimated payroll of approximately $109.6 million for the entire year.

96. Upon information and belief, SnapMed also negligently misrepresented the total annual payroll for some of the states for which SnapMed sought coverage.

97. For example, in the January Application, SnapMed estimated that its total annual payroll for California would be approximately $5.5 million.

98. However, the January 2022 audit revealed that SnapMed's payroll in California for the period of March 9, 2021 to April 1, 2021 was approximately $43.8 million, about eight times more than the estimated payroll reported in the January Application.

99. Given the huge disparity between the estimated annual payroll figures reported in the January Application and the actual payroll figures determined in the January 2022 audit for the period of March 9, 2021 to April 1, 2021, SnapMed knew or should have known that the estimated payroll figures reported in the January Application were false and/or inaccurate.

100. Moreover, given the huge increase in payroll between Q4 2020 and Q1 2021 as reported in SnapMed's quarterly tax returns, SnapMed knew or should have known that, as a result of SnapMed's exponential growth between these two quarters, the estimated payroll figures reported in the January Application were false and/or inaccurate.

101. NL&F reasonably relied upon the estimated annual payroll figures SnapMed provided in the January Application to calculate the estimated premium for the 2021 Stub Policy.

102. NL&F suffered pecuniary harm as a result of SnapMed's misrepresentations.

## FIFTH COUNT – INNOCENT MISREPRESENTATION

1-102. Plaintiff repeats and re-alleges paragraphs 1-102 as if fully set forth herein.

103. SnapMed made representations of material fact concerning its estimated annual payroll in the January Application.

104. SnapMed made these representations for the purpose of inducing NL&F to renew its coverage for workers compensation and employer's liability coverage.

105. The representations SnapMed made in the application were untrue, as the actual payroll figures for the term of the 2021 Stub Policy were substantially different from SnapMed's estimated payroll figures provided in the January Application.

106. NL&F justifiably relied on the representations related to SnapMed's estimation of its annual payroll made in the January Application.

-13-

107. As a result of SnapMed's representations in the January Application, NL&F has suffered and continues to suffer damages.

### SIXTH COUNT – VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA")

1-107. Plaintiff repeats and re-alleges paragraphs 1-107 as if fully set forth herein.

108. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. State. § 42-110b(a).

109. SnapMed is a "person" within the meaning of CUTPA.

110. SnapMed engaged in trade and commerce in the State of Connecticut within the meaning of CUTPA.

111. SnapMed's conduct as described above was unfair within the meaning of CUTPA because it: (a) offends public policy as it has been established by statutes, common law, or otherwise; (b) was immoral, unethical, oppressive, and unscrupulous; and (c) caused substantial injury to NL&F.

112. SnapMed's conduct was immoral, unethical, oppressive, and unscrupulous in that it made misrepresentations that it knew or should have known were false and/or inaccurate in the January Application.

113. SnapMed's conduct also was immoral, unethical, oppressive, and unscrupulous in that it breached multiple contracts with NL&F.

114. SnapMed breached its obligations under the 2020 Policy by failing to comply with the audit for the 2020 Policy.

115. Upon information and belief, SnapMed also has breached the 2020 Policy in that it has not paid NL&F the additional premiums it is owed.

116. Upon information and belief, although NL&F has been unable to determine the final total premium for the 2020 Policy due to SnapMed's failure to cooperate with the audit, the total premium for the 2020 Policy is an estimated $4.2 million.

117. To date, SnapMed has paid only $90,739 in premiums for the 2020 Policy.

118. In addition to its breach of the 2020 Policy, SnapMed also has breached its obligations under the 2021 Stub Policy by failing to pay NL&F the additional premium owed as determined by the revised audit of the 2021 Stub Policy.

119. As a direct and proximate cause of SnapMed's CUTPA violations, NL&F has suffered an ascertainable loss of money and property.

**WHEREFORE**, the Plaintiff claims:

(1) Compensatory damages in the amount of the unpaid premium due Plaintiff under the 2020 Policy and 2021 Stub Policy;

(2) A declaratory judgment that SnapMed is required under the 2020 Policy to permit NL&F to audit its books and records that relate to the policy, and required to pay NL&F any additional premium due as a result of that audit;

(3) Punitive damages pursuant to General Statutes § 42-110g(a)

(4) Attorneys' fees and costs pursuant to General Statutes § 42-110g(d); and

(5) Such other relief as this Court determines to be just and equitable.

PLAINTIFF,
NATIONAL LIABILITY & FIRE INSURANCE COMPANY

By: */s/ Daniel L. FitzMaurice*
Daniel L. FitzMaurice
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
Telephone: (860) 275-0100
Facsimile: (860) 275-0343
Its Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above will immediately be delivered electronically to all counsel of record as follows:

Amanda Thompson
SnapMedTech, Inc.
1201 Peachtree Street NE
Building 400, Suite 1800
Atlanta, GA 30361
amanda.thompson@snapnurse.com

/s/ Daniel L. FitzMaurice
Daniel L. FitzMaurice