UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATIONAL LIABILITY & FIRE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>SNAPMEDTECH, INC.,<br><br>Defendant. | CIVIL ACTION NO.<br><br>3:22-CV-00780-OAW<br><br><br><br><br><br>AUGUST 26, 2022 |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

Plaintiff National Liability & Fire Insurance Company respectfully submits this Memorandum of Law in Opposition to Defendant SnapMedTech, Inc.'s Motion to Dismiss (ECF 16.)

**I.     Introduction**

This dispute arises from two, sequential Workers Compensation and Employers Liability Insurance Policies that the Plaintiff, National Liability & Fire Insurance Company ("Plaintiff" or "NL&F") issued to the Defendant, SnapMedTech, Inc. ("Defendant" or "SnapMed"). SnapMed is a staffing agency in the healthcare field: it supplies nurses and other professionals to hospitals, nursing homes, and others. During the pandemic, SnapMed's payrolls and revenues grew astronomically. This action concerns workers' compensation insurance that SnapMed bought from NL&F but then refused to pay for and to provide the information it promised to supply.

Each NL&F policy provided for SnapMed to pay an initial premium based on estimates of its payroll. After the policy ended, NL&F was to audit SnapMed's records and assess the final premium based on the actual payroll. Where, as here, the final premium exceeds the initial

premium, the policyholder owes the unpaid portion.  SnapMed did not cooperate in the audits, however.  It ultimately provided sufficient information for NL&F to complete the audit and determine the final premium for only the second of the two policies.  SnapMed then refused to pay what it owed for the second policy.  Moreover, the audit provided evidence that SnapMed made misrepresentations – either negligently or innocently[1] – about its estimated payroll, when it applied for the second policy.  In this action, NL&F demands over $1.4 million in unpaid premiums on the second policy and seeks the information needed to complete the audit of the first policy and to recover all additional premium that the audit reveals.

SnapMed has moved to dismiss three of the counts of NL&F's six-count Complaint.  With respect to Counts Four and Five, SnapMed contends that NL&F failed to plead sufficient facts to comply with the heightened pleading requirements of Rule 9(b).  These counts allege negligent and innocent misrepresentation respectively.  Although Courts in this District have split on whether Rule 9 applies to claims of negligent misrepresentation, none have held that rule applies to innocent misrepresentation.  Even if Rule 9 did apply to NL&F's claim of negligent misrepresentation, Count Four satisfies that standard, because it identifies SnapMed's misrepresentations with sufficient particularity.

SnapMed also moves to dismiss Count Six, arguing that it alleges merely a breach of contract and not facts sufficient to establish a violation of the Connecticut Unfair Trade Practices Act ("CUTPA").  The Complaint, however, alleges a level of misconduct by SnapMed that exceeds simply breaching the parties' contracts.

---

[1] SnapMed's misrepresentations very well could have been intentional, and NL&F reserves the right to amend its Complaint if evidence uncovered in discovery supports such a claim.

Accordingly, the Court should deny SnapMed's motion to dismiss because NL&F states plausible and legally sufficient claims for negligent misrepresentation, innocent misrepresentation, and CUTPA:

    (1)    NL&F's negligent misrepresentation allegations sufficiently put SnapMed on notice of the statements comprising its claim, regardless of which pleading standard the Court applies;

    (2)    Rule 9(b) does not apply to innocent misrepresentation claims, and NL&F alleges facts supporting each element of such a claim; and

    (3)    NL&F's CUTPA claim alleges: (1) sufficient aggravating factors that bring SnapMed's breaches of contract into CUTPA's purview; (2) SnapMed's unfair and deceptive conduct occurred in the course of its primary line of business; and (3) NL&F sustained an ascertainable loss as a result of SnapMed's conduct.

## II.    Factual Background[2]

SnapMed is a staffing agency that provides a technology platform which connects healthcare professionals with facilities. (ECF 1 ¶ 8.) SnapMed employs healthcare professionals and places them with hospitals and other healthcare facilities to fill immediate and long-term staffing needs. (*Id.*) SnapMed experienced significant growth in 2020 as a result of the COVID-19 pandemic, and grew by 77,000% in 2020. (*Id.* ¶ 9.)

In 2020, SnapMed applied for workers compensation and employment liability insurance with NL&F. (*Id.* ¶ 10.) NL&F issued a Workers Compensation and Employers Liability Insurance Policy, bearing number V9WC163779, to SnapMed, effective for the period of March

---

[2] The Complaint serves as the basis of the facts alleged in this section. For purposes of SnapMed's motion, "the Court . . . takes the plaintiff's factual allegations in the complaint 'to be true and [draws] all reasonable inferences in' its favor." *Parmlee v. Officer of Att'y Gen.*, No. 3:21-CV-01292, 2022 WL 1462247, at *2 (D. Conn. May 9, 2022) (*quoting Harris v. Mills,* 572 F.3d 66, 71 (2d Cir. 2009)).

9, 2020 to March 9, 2021 (the "2020 Policy"). (*Id.*) The 2020 Policy required SnapMed to pay a total estimated annual premium, which NL&F calculated using payroll and job classification information that SnapMed provided to NL&F. (*Id.* ¶¶ 12-13.) The 2020 Policy further required SnapMed to pay a final premium, which NL&F would calculate after the policy ended "by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium [SnapMed] paid to us, [SnapMed] must pay us the balance." (*Id.* ¶ 14.) The 2020 Policy also required SnapMed to allow NL&F to "examine and audit all [SnapMed's] records that related to this policy" and that "[i]nformation developed by audit will be used to determine final premium." (*Id.* ¶¶ 16-17.)

The 2020 Policy initially covered work in only Georgia, Nevada, and California. (*Id.* ¶ 19.) Between April 2020 and October 2020, however, NL&F endorsed the 2020 Policy numerous times at SnapMed's request to add new locations in various states. (*Id.* ¶ 20.) These endorsements added coverage to new SnapMed locations in twenty additional states for additional premiums based on estimates that SnapMed provided of its exposure basis, including payroll, in the added locations. (*Id.* ¶ 21.)

On or around January 28, 2021, SnapMed applied to renew its workers compensation and employers liability coverage with NL&F. (*Id.* ¶ 22.) In its application dated January 28, 2021 (the "January Application"), SnapMed sought coverage from NL&F in twenty states. (*Id.* ¶ 23.) In the January Application, SnapMed provided NL&F with payroll estimates for each state in which it sought coverage. (*Id.* ¶ 24.) There was a huge disparity, however, between these estimated amounts and the actual payroll figures that SnapMed later submitted in connection with an audit. (*Id.* ¶¶ 26-38.) Given this disparity and SnapMed's awareness of the tremendous

and ongoing demand for medical personnel in the midst of the pandemic and, correspondingly, the astronomical growth in the number of its employees, SnapMed knew or should have known that the estimated figures it provided to NL&F in the January Application were false.  (*Id.* ¶ 38.)

On March 2, 2021, NL&F prepared a Proposal of Insurance for SnapMed.  (*Id.* ¶ 39.)  In the Proposal of Insurance, NL&F relied upon SnapMed's estimated payroll figures to calculate the estimated annual premium.  (*Id.* ¶ 40.)  NL&F then issued a second Workers Compensation and Employers Liability Insurance Policy, bearing number V9WC224917, to SnapMed, with a policy period to run from March 9, 2021 to March 9, 2022 (the "2021 Stub Policy").  (*Id.* ¶ 41.)  Like the 2020 Policy, the 2021 Stub Policy also required SnapMed to pay a total estimated annual premium and then, following an audit, a final premium.  (*Id.* ¶ 42.)  At SnapMed's request, NL&F later agreed to cancel the 2021 Stub Policy effective April 1, 2021.  (*Id.* ¶ 45.)

Pursuant to the terms of both the 2020 Policy and the 2021 Stub Policy, NL&F contacted SnapMed to schedule a premium audit for both policies.  (*Id.* ¶¶ 46-48, 53-54.)  SnapMed failed to cooperate fully with the 2020 Policy audit, and NL&F's third-party auditor returned the 2020 Policy audit as unproductive because SnapMed did not provide it with access to the necessary documents.  (*Id.* ¶¶ 51-52.)  SnapMed also failed to respond to NL&F's numerous requests for information concerning the audit, in direct breach of the 2020 Policy.  (*Id.* ¶¶ 16-17, 66-67, 74.)

SnapMed also breached the 2021 Stub Policy.  SnapMed complied with the audit on the 2021 Stub Policy, and NL&F determined that the final premium for the 2021 Stub Policy through the April 1, 2021 cancellation date was $1,509,397.  (*Id.* ¶¶ 55, 73.)  To date, however, SnapMed has issued only one payment of $109,240 for the 2021 Stub Policy, leaving a balance due of $1,400,157.  (*Id.* ¶ 76.)

On June 16, 2022, NL&F filed a six-count Complaint, asserting claims against SnapMed for: (1) breach of the 2020 Policy; (2) breach of the 2021 Stub Policy; (3) declaratory judgment with respect to audit; (4) negligent misrepresentation; (5) innocent misrepresentation; and (6) violation of CUTPA. On August 5, 2022, SnapMed moved to dismiss Counts Four, Five, and Six. For the reasons stated below, NL&F's Complaint asserts legally sufficient misrepresentation and CUTPA claims, and NL&F respectfully requests that the Court deny SnapMed's Motion to Dismiss.

### III. Standard of Review

As the Second Circuit explained in a decision issued in April of this year:

> A court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient. *Festa v. Loc. 3 Int'l Brotherhood of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990). Consequently, a complaint will survive a motion to dismiss under Rule 12(b)(6) if it alleges facts that, taken as true, establish plausible grounds to sustain a plaintiff's claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018).

*Cornelio v. Connecticut*, 32 F.4th 160, 168–69 (2d Cir. 2022).

### IV. Argument

#### A. NL&F Pleads A Legally Sufficient Claim of Negligent Misrepresentation

SnapMed argues that NL&F's negligent misrepresentation claim fails as a matter of law because it does not meet Rule 9's heightened pleading standard. Even assuming the heightened standard applies, NL&F's allegations are legally sufficient.

Courts in this District (and others) have disagreed over whether the Rule 9 standards apply to claims of negligent misrepresentation. Judge Meyer has identified the distinguishing factor as whether the allegations are "couched in fraud-like terms of known falsity." *Herlth v. Merck & Co.*, No. 3:21-CV-438, 2022 WL 788669, at *10 (D. Conn. Mar. 15, 2022) (citations

omitted).  For example, in *Herlth*, the complaint coupled a claim of negligent misrepresentation with a claim for intentional misrepresentation by accusing the defendant of making statements it knew to be untrue.  *Id.* at *7, *10.  Even where Rule 9(b) applies, to state a claim of negligent misrepresentation, the complaint meets the heightened pleading standard where it "details the particular statements that serve as the basis for its claim, specifies the relevant speakers , . . states the times that the statements were made[, and alleges] sufficient facts explaining why the statements were negligent."  *ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.*, No. 3:17-CV-00790, 2018 WL 1368908, at *6 (D. Conn. Mar. 16, 2018) (noting also that the complaint "need only plead "the factual basis which gives rise to a strong inference' of negligence rather than a particular motive or opportunity to lie.) (citing *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 Fed. Appx. 744, 747 (2d Cir. 2009).)

In this case, NL&F has not "couched" its allegations of misrepresentation against SnapMed "in fraud-like terms of known falsity."  Rather, the Complaint uses a classic, negligence formulation by asserting what SnapMed should have known based on facts it did know:   "as a result of the huge jump in payroll between Q4 2020 and Q1 2021, SnapMed knew that its business was increasing exponentially and ***should have known*** that the estimated payroll figures it provided in the January Application were false and/or inaccurate."  (ECF 1 ¶ 38 (emphasis added).)  These allegations state a viable claim for negligent misrepresentation under Connecticut law.  *See Peterson v. McAndrew*, 160 Conn. App. 180, 204 (2015) ("Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result.").

Even if the heightened pleading requirements of Rule 9(b) were to apply to NL&F's claim of negligent misrepresentation, the allegations in the Complaint meet those requirements. The fourth count specifically identifies the "time, place, speaker and content of the alleged misrepresentation. *Meyers v. PNC Fin. Servs. Grp., Inc*., No. 3:19-CV-01892, 2020 WL 7645436, at *12 (D. Conn. Dec. 23, 2020):

| Issue | ECF 1 ¶ | Content |
| --- | --- | --- |
| When | 22, 23 | "On or around January 28, 2021 and before the 2020 Policy expired, SnapMed applied to renew its workers compensation and employers liability coverage with NL&F." |
| Where | 23 | In its application dated January 28, 2021 . . . |
| Who | 23, 24 | SnapMed |
| What | 24, 26 | "For each state in which it sought coverage, SnapMed provided an 'estimated annual remuneration/payroll.'" "In its application, SnapMed estimated a total annual payroll for all states of approximately $109.6 million." |

As for the facts that give "'rise to a strong inference' of negligence," the Complaint asserts several. Together with reasonable inferences from the numbers cited, they include:

- "[A]s a result of the pandemic, SnapMed experienced extraordinary growth, significantly expanding the pool of healthcare professionals it employs to meet the needs of its clients and increasing its revenues by 77,000% in 2020." (ECF 1 ¶ 9.)
- The 2020 Policy initially covered work in only three states, but SnapMed requested amendments during the course of the year to add twenty more states. (*Id.* ¶¶ 19-21.)

    • In 2020, SnapMed's payroll rose from $159,922.08 at the end of Q1 (March 31, 2020) to $22,741,961.64 by year end. (*Id.* ¶¶ 32, 35.) This amounts to an increase of 14,121%.[3]

    • "[A]s a result of the huge jump in payroll between Q4 2020 and Q1 2021, SnapMed knew that its business was increasing exponentially and should have known that the estimated payroll figures it provided in the January Application were false and/or inaccurate." (*Id.* ¶ 38.)

These facts and inferences alone suffice to support NL&F's claim that SnapMed "should have known" of the inaccuracy or falsity of its estimated payroll for the 2021 Stub Policy of $109.6 million.

    In addition to foregoing, the Complaint also alleges three facts that, in whole or in part, look backwards by using some data available only after January 28, 2021:

    • In California, SnapMed estimated that its annual payroll would be approximately $5.5 million when its actual payroll was $43.8 million, about eight times more than the estimated payroll reported in the January Application (ECF 1 ¶¶ 29,30);

    • "SnapMed reported a total payroll of $216,009,590.76 for January, February, and March of 2021 ("Q1 2021") in its quarterly tax return for that period." (*Id.* ¶ 36); and

    • "SnapMed reported a total payroll of $125,174,273.51 for April, May, and June of 2021 in its quarterly tax return for that period." (*Id.* ¶ 37);

SnapMed complains that these allegations are unfair, because they attempt to show falsity "by hindsight." If that were all that the Complaint alleged, SnapMed might have a point. But the Complaint relies on SnapMed's history in 2020 as well as other contextual facts that SnapMed knew to support the inference that, at a time of phenomenal growth, it should have known that its estimates were false or inaccurate. As several courts have recognized "evidence of later events

---

[3] $22,741,961.64 - $159,922.08 = $22,582,039.56; $22,582,039.56/$159,922.08 = 14,121%.

can provide useful circumstantial evidence that a given representation was false when made." *Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019), as revised (June 6, 2019); *see also Yannes v. SCWorx Corp.*, No. 20-CV-03349, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021) ("Courts in this circuit have held that "[t]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made.") (citations and internal quotations omitted).  For example, the Complaint alleges that SnapMed's estimated payroll for the State of California was off by a multiple of more than eight.  Although SnapMed may be able to find some way to explain that enormous difference, it is not unfair or unreasonable to infer from this circumstantial evidence and in light of all of the other contextual facts that SnapMed should have known that its estimate was false or inaccurate.

Nevertheless, SnapMed argues that it could not possibly know of any jump in its payroll between Quarter Four of 2020 and Quarter One of 2021.  In making this argument, SnapMed narrowly construes NL&F's allegations and ignores the reasonable inferences that the Court can draw from them.  SnapMed reported a total payroll of $22,741,961.64 for Quarter Four of 2020 and a total payroll of $216,009,590.76 for Quarter One of 2021, approximately nine-and-one-half times that of Quarter Four of 2020.  (ECF 1 ¶¶ 35-36.)  Moreover, as a result of the COVID-19 pandemic, SnapMed experienced extraordinary growth, significantly expanding the pool of healthcare professionals it employed to meet the needs of its clients and increasing its revenues by 77,000 percent.  (*Id.* ¶ 9.)  Given the astronomical, nine-and one-half times growth in payroll that SnapMed experienced between quarters, along with SnapMed's general awareness of the tremendous and ongoing demand for medical personnel in the midst of the pandemic, the reasonable inference follows that SnapMed knew or should have known that it was underreporting its payroll estimates in the January Application.  Moreover, it is also reasonable

to infer that this flood of new employees did not appear magically on SnapMed's payroll one day, with nothing to alert SnapMed to this ongoing development.  To the contrary, the reasonable inference is that SnapMed had access to information, such as daily records of all new hires, that should have alerted it to the fact that it was severely underestimating the payroll figures in its application.  NL&F's allegations, therefore, are not contradictory or erroneous as SnapMed contends.

In terms of specifically identifying the alleged misrepresentations, NL&F has pinpointed the payroll estimates in the January Application.  Moreover, NL&F has alleged several facts to support its contention that SnapMed should have known that these estimates were false, including SnapMed's exponential growth during the COVID-19 pandemic.  These allegations sufficiently put SnapMed on notice of the statements comprising NL&F's negligent misrepresentation claim and satisfy Rule 9(b)'s particularity requirement.

In sum, NL&F alleges a legally sufficient negligent misrepresentation claim against SnapMed, regardless of whether this Court applies Rule 9(b)'s heightened pleading standard.  Accordingly, NL&F respectfully requests that the Court deny SnapMed's motion to dismiss Count Four of its Complaint.

> **B.      NL&F Pleads A Legally Sufficient Innocent Misrepresentation Claim**

"The elements of [innocent misrepresentation] are (1) a representation of material fact, (2) made for the purpose of inducing the purchase, (3) the representation is untrue, and (4) there is justifiable reliance by the plaintiff on the representation by the defendant and (5) damages." *McConologue v. Smith & Nephew, Inc.,* 8 F. Supp. 3d 93, 112 (D. Conn. 2014); *Peterson*, 160 Conn. App. at 204 (same).   The Complaint alleges each and every one of these elements. Nevertheless, SnapMed challenges the sufficiency of NL&F's claim by attempting to add

innocent misrepresentation to the list of claims subject to Rule 9(b)'s heightened pleading standard. SnapMed offers no authority to support this contention, because there is none.

To apply Rule 9 to innocent misrepresentation, SnapMed relies entirely on overgeneralization. Without specifically addressing NL&F's innocent misrepresentation claim, SnapMed declares that "claims for misrepresentation are subject to the Rule 9 heightened pleading requirements." (ECF 16-1 at 5.) None of the cases that SnapMed cites, however, applies Rule 9 to innocent misrepresentation.

Nor is there any principled basis to impose heightened pleading standards to claims of innocent misrepresentation. "Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit . . . ." (Internal quotation marks omitted.) *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *see also U.S. ex rel. Williams v. Martin-Baker Aircraft Co*., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (Rule 9(b) "discourage[s] the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude. . . . And because 'fraud' encompasses a wide variety of activities, the requirements of Rule 9(b) guarantee all defendants sufficient information to allow for preparation of a response.") (citation omitted). By definition, none of these rationales applies to claims of *innocent* misrepresentation, which lacks the culpability of fraud or even negligent misrepresentation. *Farrell v. Johnson & Johnson*, 335 Conn. 398, 417, 419, 238 A.3d 698, 711 (2020) (Noting that the Court has "held that an innocent misrepresentation is actionable, even though there [is] no allegation of fraud or bad faith . . . " and that innocent misrepresentation "is based on principles of warranty") (citations omitted).

Accordingly, the Court should reject SnapMed's attempt to apply Rule 9(b)'s heightened pleading standards to NL&F's claim of innocent misrepresentation.[4]

NL&F alleges that (1) SnapMed made misrepresentations of material fact concerning its estimated annual payroll in the January Application; (2) SnapMed made these representations for the purpose of inducing NL&F to renew its coverage; (3) the representations that SnapMed made in the January Application were untrue; (4) NL&F justifiably relied on these representations to calculate the estimated annual premium for the 2021 Stub Policy; and (5) NL&F suffered damages as a result of SnapMed's misrepresentations.  (ECF 1 ¶¶ 40, 103-107.)  NL&F, thus, alleges facts supporting each element of an innocent misrepresentation claim.  Accordingly, NL&F respectfully requests that the Court deny SnapMed's motion as to Count Five.

### C. NL&F Alleges A Legally Sufficient CUTPA Claim

Finally, SnapMed argues that NL&F's CUTPA claim fails as a matter of law.  Specifically, SnapMed argues that NL&F's CUTPA claim fails because it simply recasts NL&F's breach of contract claim, that SnapMed did not perform the practice at issue in the conduct of SnapMed's "trade or commerce," and that NL&F fails to allege any proper ascertainable loss.  None of SnapMed's arguments have merit.  Accordingly, the Court should deny SnapMed's motion to dismiss Count Six of NL&F's Complaint.

#### 1. The Presence of Aggravating Factors Bring SnapMed's Conduct into CUTPA's Purview.

CUTPA provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages."  Conn. Gen.

---

[4] Even if Rule 9 did apply (and it does not), the fifth count incorporates by reference facts alleged in earlier counts, which include the detailed allegations about the particulars of SnapMed's misstatements.

Stat. § 42-110g.  It further provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b.

Generally, a "breach of contract alone is insufficient to state a CUTPA claim absent substantial aggravating circumstances."  *ARMOUR Cap. Mgmt. LP*, 2018 WL 1368908, at *8.  "Conduct that has been held to be substantial aggravating circumstances sufficient to support CUTPA claims includes fraudulent representations, fraudulent concealment, false claims[,] and multiple breaches of contract[.]"  *Bartold v. Wells Fargo Bank, N.A.*, No. 14CV00865, 2015 WL 7458504, at *6 (D. Conn. Nov. 24, 2015).  "Negligent misrepresentation suffices . . . as an aggravating factor making a breach of contract action also the basis of a CUTPA claim."  *Id.*  "Even an innocent misrepresentation can amount to a CUTPA violation . . . if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth."  *Jolen, Inc. v. Brodie & Stone, PLC*, No. FBTCV156053151, 2016 WL 3179753, at *4 (Conn. Super. Ct. May 13, 2016).

NL&F alleges sufficient aggravating factors in support of its CUTPA claim.  First, NL&F alleges that SnapMed breached two independent contracts: the 2020 Policy and the 2021 Stub Policy.  (ECF 1 at ¶¶ 77-89.)  These multiple breaches of contract alone are sufficient aggravating factors to support NL&F's CUTPA claim.  *Bartold*, 2015 WL 7458504, at *6.  Second, NL&F alleges that SnapMed negligently misrepresented the payroll estimates in the January Application.  (*Id.* ¶¶ 94-107.)  For the reasons explained above, NL&F's claims for negligent and innocent misrepresentation comport with the applicable pleading standards and are legally sufficient.  As such, they constitute further supporting aggravating factors for NL&F's CUTPA claim.  *Id.*; *Jolen, Inc.*, 2016 WL 3179753, at *4.  Accordingly, contrary to SnapMed's

contentions, NL&F does not simply recast its breach of contract claims in asserting a CUTPA claim against SnapMed.

### 2. SnapMed Committed The Practices At Issue In The Conduct Of Its Trade Or Commerce

SnapMed argues that NL&F's CUTPA claim fails because NL&F does not allege that the actions giving rise to its CUTPA claim took place in the course of SnapMed's trade or business. Specifically, SnapMed contends that "NL&F's entire complaint is not premised on SnapMed's staffing business.  It is premised on SnapMed's alleged failure to pay premiums to NL&F." (ECF 16-1 at 8-9.)  In making this argument, SnapMed narrowly construes the "trade or commerce" element of a CUTPA claim and the central purpose of its business.

CUTPA defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Con. Gen. Stat. § 42-110a.  Generally, "a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce. . . .  Therefore, the appropriate analysis is whether the practices or activities that the plaintiff relies upon arise out of a transaction that is not the defendant's primary trade or business." *Osberg v. Yale University*, No. CV085021879S, 2009 WL 659072, at \*6 (Conn. Super. Ct. Feb. 11, 2009).  "While Connecticut courts have dismissed CUTPA claims on this basis where the allegations raise an isolated issue that is clearly distinct from the defendant's primary line of business, they have not done so when the allegations assert that the conduct bears an adequate connection to that primary trade." *Passaro-Henry v. Allstate Ins. Co.*, No. 3:10CV450, 2010 WL 5174405, at \*9 (D. Conn. Dec. 15, 2010).

SnapMed is a staffing agency that employs healthcare professionals and places them in hospitals and other healthcare facilities. (ECF 1 ¶ 8.) Securing workers' compensation insurance, and paying the attendant premiums, bear an adequate connection to SnapMed's primary business as a staffing agency. Indeed, the laws of most states specifically require employers like SnapMed to purchase workers' compensation insurance for their employees. *See, e.g.*, Conn. Gen. Stat. § 31-284. Accordingly, SnapMed's purchase of workers' compensation insurance from NL&F, and its failure to comply with its contractual obligations under those policies, are not merely incidental to SnapMed's primary trade. *See Passaro-Henry*, 2010 WL 5174405, at *9; *Osberg*, 2009 WL 659072, at *6.

### 3. NL&F Alleges A Proper Ascertainable Loss

In order to bring a claim under CUTPA, a party must be able to show that it has suffered "any ascertainable loss of money or property, real or personal. . . . CUTPA . . .does not require a plaintiff to prove a specific amount of actual damages in order to make out a *prima facie* case. . . . Rather, an ascertainable loss is a deprivation, detriment or injury that is capable of being discovered, observed, or established, and [a] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." (Citations omitted; internal quotation marks omitted.) *Found Cap. Res., Inc. v. Prayer Tabernacle Church of Love, Inc.*, No. 3:17CV00135, 2018 WL 4697281, at *12 (D. Conn. Sept. 30, 2018).

SnapMed argues that NL&F's CUTPA claim fails because NL&F has not alleged any "ascertainable loss" other than its barebones conclusion that it suffered an "ascertainable loss of money and property." (ECF 16-1 at 9.) As SnapMed acknowledges in its brief, however, a plaintiff can sufficiently allege that it suffered a measureable ascertainable loss "even though the precise amount of loss is not known." (*Id.* at 9-10.) Here, NL&F's Complaint contains specific

allegations relating to the ascertainable losses that NL&F suffered.  NL&F alleges that SnapMed's failure to pay the final premium for the 2021 Stub Policy in full damaged NL&F in the amount of not less than $1,400,157.  (ECF 1 ¶¶ 88-89.)  These allegations more than sufficiently support NL&F's claim that it suffered an ascertainable loss.  Moreover, even though NL&F does not yet know the full extent of its damages for SnapMed's breach of the 2020 Policy, NL&F can measure those damages once SnapMed complies with an audit for that policy. (*Id.* ¶¶ 84.)  NL&F thus offers more than barebones, conclusory, or general allegations concerning the ascertainable losses that SnapMed's conduct caused it to incur.

## V.     Conclusion

For the foregoing reasons, NL&F respectfully requests that the Court deny SnapMed's motion to dismiss Counts Four, Five, and Six of NL&F's Complaint.

**PLAINTIFF,**
**NATIONAL LIABILITY & FIRE**
**INSURANCE COMPANY**

By  */s Daniel L. FitzMaurice*
Daniel L. FitzMaurice (ct05331)
Catherine A. DeLanzo (ct31323)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103
(860) 275-0100
(860) 275-0343 (fax)
dlfitzmaurice@daypitney.com
cdelanzo@daypitney.com

*Attorneys for National Liability & Fire Insurance Company*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the above date a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

                                  */s/ Daniel L. FitzMaurice*
                                  Daniel L. FitzMaurice