UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATIONAL LIABILITY & FIRE INSURANCE COMPANY, | CIVIL ACTION NO. |
| Plaintiff, | 3:22-CV-00780-OAW |
| v. | |
| SNAPMEDTECH, INC., | |
| Defendant. | AUGUST 11, 2023 |

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR PREJUDGMENT REMEDY AND MOTION FOR DISCLOSURE OF ASSETS**

Plaintiff National Liability & Fire Insurance Company ("NL&F") respectfully submits this Memorandum of Law in Support of its Application for Prejudgment Remedy and related Motion for Disclosure of Assets against Defendant SnapMedTech, Inc. ("SnapMed").

**I.    INTRODUCTION**

SnapMed is a staffing agency in the healthcare field: it supplies nurses and other professionals to hospitals, nursing homes, and others. This dispute arises from two, sequential Workers' Compensation and Employer's Liability Insurance Policies that SnapMed purchased from NL&F (the "2020 Policy" and the "2021 Stub Policy"). Each of these policies provided for SnapMed to pay an initial premium, based on estimates of its payroll, and then a final premium, based on its actual payroll during the coverage period, as determined by an audit. SnapMed's payroll ballooned during the effective dates of the two policies, consistent with the extraordinary demand for nurses during the pandemic. To determine the effect on premiums of the rapid changes at SnapMed, NL&F attempted in 2021 to conduct premium audits for the 2020 Policy and 2021 Stub Policy. SnapMed did not fully cooperate with the audit on the 2020 Policy and failed to provide all of the information necessary to complete the audit. For the 2021 Stub Policy, SnapMed

ultimately provided sufficient information for NL&F to determine the final premium, but SnapMed refused to pay what it owed. On June 16, 2022, NL&F brought this action seeking declaratory and other relief, including damages for unpaid premiums.

NL&F determined the final premium for the 2020 Policy only recently, by using documents obtained during discovery in this action. The final premiums, less the earlier payments of initial premiums, equals just over $4.5 million (without interest):

| Policy | Final Premium (less initial premium previously paid) = Unpaid Amount |
|---|---|
| **2020 Policy** | $3,128,271 |
| **2021 Stub Policy** | $1,400,178.10 |
| **Total that SnapMed Owes** | $4,528,449.10 |

NL&F now seeks a prejudgment remedy to secure its ability to recover the substantial amount of unpaid premium, plus interest. Accordingly, NL&F respectfully requests that the Court grant the Application for a Prejudgment Remedy and related Motion for Disclosure of Assets.

## II.     FACTUAL BACKGROUND

### A.     SnapMed Purchases Workers' Compensation Insurance from NL&F

SnapMed is a staffing agency that provides a technology platform that connects healthcare professionals with facilities. (ECF 1 ¶ 8.) SnapMed employs healthcare professionals and places them with hospitals and other healthcare facilities to fill immediate and long-term staffing needs. (*Id.*) SnapMed experienced significant growth in 2020 as a result of the COVID-19 pandemic. (*Id.* ¶ 9.)

In 2020, SnapMed applied for workers' compensation and employer's liability insurance with NL&F. (Affidavit of Wayne Vidzicki ¶ 4) (hereinafter "Aff."). NL&F issued a Workers'

Compensation and Employer's Liability Insurance Policy, bearing number V9WC163779, to SnapMed, effective for the period of March 9, 2020 to March 9, 2021 (the "2020 Policy"). (Aff. ¶ 5.) Pursuant to the terms of the 2020 Policy, NL&F provided SnapMed with workers' compensation benefits for SnapMed's employees. (*Id.* ¶ 6.) In exchange, the 2020 Policy required SnapMed to pay a total estimated premium[1], which NL&F calculated using payroll and job classification information that SnapMed provided to NL&F. (*Id.* ¶¶ 7-8.) The total estimated premium for the 2020 Policy was $53,845, which SnapMed has paid. (*Id.* ¶ 9.)

The 2020 Policy further required SnapMed to pay a final premium, which NL&F would calculate after the policy ended "by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium [SnapMed] paid to us, [SnapMed] must pay us the balance." (Ex. 2 to Aff. at 5.) The 2020 Policy also required SnapMed to allow NL&F to "examine and audit all [SnapMed's] records that relate to this policy" and that "[i]nformation developed by audit will be used to determine final premium." (*Id.*) The 2020 Policy directed SnapMed to "pay all premium when due." (*Id.*)

The 2020 Policy initially covered work in only Georgia, Nevada, and California. (Aff. ¶ 13.) Between March 2020 and October 2020, NL&F endorsed the 2020 Policy numerous times at SnapMed's request to add new locations in various states. (*Id.* ¶ 14.) These endorsements required SnapMed to pay additional earned premiums based on payroll estimates that SnapMed provided. (*Id.*) On January 28, 2021, NL&F also endorsed the 2020 Policy to add additional

---

[1] The cost calculations for the NL&F policies, including total estimated premiums, costs for endorsements, and the final premium as determined by audit, include both the actual premium figure and State fees. For example, the $53,845 total estimated cost for the 2020 Policy is comprised of $53,574 in premium and $271 in State fees. For ease of reference, the total costs are referred to in this Memorandum as premiums.

-3-

payroll for SnapMed's locations in Massachusetts and Illinois (the "January 28, 2021 Endorsement"). (*Id.* ¶ 15.) This endorsement generated an earned premium of $50,773. (*Id.*) During the effective dates of the 2020 Policy, NL&F fulfilled its obligations under the 2020 Policy by handling the workers' compensation claims of SnapMed's employees. (*Id.* ¶ 16.)

On or around January 28, 2021, SnapMed submitted estimated payroll figures to NL&F prior to the renewal of its workers' compensation coverage with NL&F. (*Id.* ¶ 17.) NL&F issued a second Workers' Compensation and Employer's Liability Insurance Policy, bearing number V9WC224917, to SnapMed (the "2021 Stub Policy"). (*Id.* ¶ 18.) Like the 2020 Policy, the 2021 Stub Policy also required SnapMed to pay a total estimated annual premium and then, following an audit, a final premium. (*Id.* ¶ 19.) The total estimated annual premium for the 2021 Stub Policy was $1,098,758, which SnapMed could pay in monthly installments after making a down payment. (*Id.* ¶ 20.) SnapMed paid the initial down payment of $109,239.90 for this policy. (*Id.* ¶ 21.) Although the 2021 Stub Policy had stated effective dates of March 9, 2021 to March 9, 2022, NL&F notified SnapMed that it was cancelling the 2021 Stub Policy, effective May 17, 2021, because SnapMed's estimated payroll figures showed exposures that far exceeded the premium level. (*Id.* ¶ 22.) SnapMed obtained replacement workers' compensation coverage from Wesco Insurance Company, and NL&F later agreed to cancel the 2021 Stub Policy effective April 1, 2021. (*Id.* ¶ 23.)

**B.   The 2020 Policy Audit**

Pursuant to the terms of the 2020 Policy, NL&F contacted SnapMed to schedule a premium audit. (*Id.* ¶ 24.) On February 23, 2021, NL&F sent a letter to SnapMed, informing SnapMed that the 2020 Policy was about to expire and that RLD Associates ("RLD"), a third-party auditor, would contact SnapMed to schedule an appointment for the audit. (*Id.* ¶ 25.) The letter also provided

SnapMed with a non-exhaustive list of documents that RLD needed to complete the audit. (*Id.*) In March 2021, RLD contacted SnapMed to begin the auditing process for the 2020 Policy. (*Id.* ¶ 26.) In April 2021, RLD closed the audit after receiving no response from SnapMed. (*Id.* ¶ 27.) Although RLD later reopened the audit, and SnapMed provided RLD with some of the necessary documents, RLD once again returned the audit as non-productive in September 2021 after SnapMed failed to provide it with all of the required information. (*Id.* ¶¶ 28-29.)

In October 2021, NL&F re-assigned the audit for the 2020 Policy to Premium Audit Consultants on a rush basis. (*Id.* ¶ 30.) Once again, SnapMed did not provide the auditors with all of the necessary payroll information. (*Id.* ¶ 31.) Accordingly, Premium Audit Consultants was unable to complete the audit for the 2020 Policy. (*Id.*)

On June 16, 2022, NL&F filed a six-count Complaint, asserting claims against SnapMed for: (1) breach of the 2020 Policy; (2) breach of the 2021 Stub Policy; (3) declaratory judgment with respect to audit; (4) negligent misrepresentation; (5) innocent misrepresentation; and (6) violation of the Connecticut Unfair Trade Practices Act. (ECF 1.) In June 2023, NL&F finally was able to complete the audit on the 2020 Policy using documents obtained through discovery. (Aff. ¶ 32.) NL&F calculated the final premium due for the 2020 Policy by multiplying SnapMed's actual payroll for each state during the effective dates of the 2020 Policy by the appropriate rate for each employee classification code. (*Id.* ¶ 33.) When conducting the audit, NL&F's auditors independently verified the applicable class codes for SnapMed's employees based on the description of operations and individual employee job duties that SnapMed provided to them. (*Id.* ¶ 34.) NL&F also consulted the National Council on Compensation Insurance's ("NCCI") Scopes Manual when verifying the classification codes used. (*Id.* ¶ 35.) The Scopes Manual provides descriptions of the various classification codes, which are subject to approval by

the Department of Insurance in the individual states listed on the policies. (*Id.*) Pursuant to this process, NL&F determined that SnapMed owes it an additional premium of $3,077,498 for the 2020 Policy. (*Id.* ¶ 36.)

### C. The 2021 Stub Policy Audit

NL&F assigned the audit for the 2021 Stub Policy to Premium Audit Consultants. (*Id.* ¶ 37.) On May 19, 2021, NL&F sent a letter to SnapMed, informing SnapMed that the 2021 Stub Policy was about to expire and that Premium Audit Consultants, a third-party auditor, would contact SnapMed to schedule an appointment for the audit. (*Id.* ¶ 38.) SnapMed provided the auditors with the information needed to complete this audit, which Premium Audit Consultants initially conducted using policy effective dates of March 9, 2021 to May 17, 2021. (*Id.* ¶ 39.) Pursuant to the process described above, NL&F determined that the final total premium for the 2021 Stub Policy was $4,099,292. (*Id.* ¶ 40.)

On November 8, 2021, SnapMed formally disputed the 2021 Stub Policy audit. (*Id.* ¶ 41.) SnapMed claimed that NL&F used incorrect dates for the audit because SnapMed had obtained alternative workers' compensation insurance from Wesco Insurance Company effective April 1, 2021. (*Id.* ¶ 42.) SnapMed also disputed some of the classification codes used for employees in certain states. (*Id.*) In response, NL&F re-opened the audit and directed Premium Audit Consultants to remove all payroll that was issued on or after April 1, 2021. (*Id.* ¶ 43.) NL&F also informed Premium Audit Consultants that SnapMed disputed the classification codes used for some employees, and directed the auditors to address fully this issue in the re-opened audit. (*Id.*)

In January 2022, Premium Audit Consultants completed a revised audit for the 2021 Stub Policy. (*Id.* ¶ 44.) The revised audit revealed that SnapMed owes NL&F an additional premium of $1,400,178.10 for the 2021 Stub Policy through the April 1, 2021 cancellation date. (*Id.* ¶ 45.)

D. **The Unpaid Premiums**

To date, SnapMed has not issued any payment to NL&F for the additional premiums it owes for the 2020 Policy and the 2021 Stub Policy. (*Id.* ¶ 46.) SnapMed also never paid the $50,773 earned premium for the January 28, 2021 Endorsement. (*Id.* ¶ 47.) The balance due for both policies is as follows:

| The 2020 Policy | |
|---|---|
| Earned premium from unpaid endorsements | $50,773 |
| Additional premium as determined by audit | $3,077,498 |
| Total | $3,128,271 |

| The 2021 Stub Policy | |
|---|---|
| Additional premium as determined by audit | $1,400,178.10 |
| Total | $1,400,178.10 |

In total, SnapMed owes NL&F the principal amount of $4,528,449.10 in premiums for the two policies, plus interest. (*Id.* ¶ 48.)

III. **ARGUMENT**

NL&F is entitled to a prejudgment remedy in the amount of $4,981,294.01 because there is probable cause that a judgment in at least that amount will be rendered in its favor on its breach of contract claims.

A. **Legal Standard**

Rule 64(a) of the Federal Rules of Civil Procedure provides that in a federal civil action "every remedy is available that, under the law of the state where the court is located, provides for

seizing a person or property to secure satisfaction of the potential judgment." Rule 4(c) of the Local Rules of Civil Procedure for the District of Connecticut further provides that "a party may secure a pre-judgment remedy . . . as permitted by, and in accordance with, the law of the State of Connecticut."

Under Connecticut law, a prejudgment remedy means "any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment." Conn. Gen. Stat. § 52-278d(a). A prejudgment remedy is available if the court finds "probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought." Conn. Gen. Stat. § 52-278d(a). Should the court find "that a prejudgment remedy securing the judgment should be granted, the prejudgment remedy applied for shall be granted as requested or as modified by the court." *Id.*

"Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. . . . The legal idea of probable cause is a *bona fide* belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . [P]robable cause is a flexible common-sense standard. . . . [I]t does not demand that a belief be correct or more likely true than false. . . . Under this standard, the function of the trial court is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits" *United of Omaha Life Ins. Co. v. Connecticut Student Loan Found.*, 718 F. Supp. 2d 277, 285 (D. Conn. 2010). Moreover, in determining the amount of the remedy, "[d]amages need not be established with mathematical

precision but must be based on evidence yielding a fair and reasonable estimate." *SEI Fuel Servs., Inc. v. A&J Gas & Convenience, LLC*, No. 3:18-CV-1553, 2019 WL 6828431, at *2 (D. Conn. Dec. 13, 2019).

### B. NL&F Satisfies the Probable Cause Standard for the Granting of a Prejudgment Remedy

In Connecticut, the "elements of a breach of contract claim are the formation of any agreement, performance by one party, breach of the agreement by the other party, and damages." *Michel v. Yale Univ.*, 547 F. Supp. 3d 179, 188-89 (D. Conn. 2021). "[T]he [i]nterpretation of an insurance policy, like the interpretation of other written contracts, involves a determination of the intent of the parties as expressed by the language of the policy. . . . The policy words must be accorded their natural and ordinary meaning . . . ." *Ed Const., Inc. v. CNA Ins. Co.*, 130 Conn. App. 391, 401 (2011).

It is not only probable, but overwhelmingly likely, that NL&F will prevail on its breach of contract claims. The first two elements of the cause of action – formation of a contract and performance by one party – are undisputed. NL&F and SnapMed entered into two enforceable contracts – the 2020 Policy and the 2021 Stub Policy. (*See* Exs. 1 and 4 to Aff.) NL&F provided SnapMed with workers' compensation insurance during the effective dates of the two policies, and handled and paid covered claims.[2] (Aff. ¶16.)

NL&F will demonstrate probable cause on the third and fourth elements – breach of the agreement by the other party and damages. The plain and unambiguous terms of the 2020 Policy and the 2021 Stub Policy require SnapMed to pay a final premium, which NL&F calculates after

---

[2] Although SnapMed has not yet answered NL&F's Complaint due to the pendency of its Motion to Dismiss, SnapMed has never indicated an intent to argue that NL&F did not perform its obligations under either of the two policies.

-9-

the policy ends "by using the actual, not the estimated, premium basis and the proper classifications and rates." (Ex. 2 to Aff. at 5.) The policies also required SnapMed to allow NL&F to "examine and audit all [SnapMed's] records that related to this policy" and that "[i]nformation developed by audit will be used to determine final premium." (*Id.*)

Pursuant to its clear and express right under the policies, NL&F attempted to audit SnapMed's records to calculate the final premium owed to NL&F for the two policies. (Aff. ¶¶ 25-30.) SnapMed breached its contractual obligations under the 2020 Policy by failing to provide NL&F's auditors with the necessary documents to complete the audit for that policy. (*Id.* ¶¶ 29, 31.) NL&F only completed the audit for the 2020 Policy after commencing litigation and receiving the necessary documents through discovery. (*Id.* ¶ 32.) The audit revealed that NL&F is entitled to an additional premium of $3,077,498, which SnapMed has not paid. (*Id.* ¶¶ 36, 46.) SnapMed also owes NL&F $50,773 in earned premium for the January 28, 2021 Endorsement. (*Id.* ¶ 47.)

SnapMed complied with the audit for the 2021 Stub Policy, and NL&F determined through the audit that SnapMed owes NL&F $1,400,178.10 in additional premiums. (*Id.* ¶ 45.) SnapMed has failed to fulfill its contractual obligation of "pay[ing] all premium when due" and has yet to issue any payment to NL&F for this amount. (*Id.* ¶ 46.)

NL&F suspects that SnapMed will argue that NL&F cannot demonstrate probable cause that it owes NL&F $4,528,449.10 in premiums for the two policies because NL&F used incorrect classification codes for some of its employees. (Joint Report of Rule 26(f) Meeting, ECF 20 at 4 "Plaintiff used improper classification codes resulting in an inaccurate premium calculation.") But NL&F originally wrote the policies using classification code information that SnapMed itself provided in its applications. (Aff. ¶ 8.) More importantly, when auditing the two policies, NL&F's auditors independently verified the applicable class codes for SnapMed's employees based on the

-10-

description of operations and individual employee job duties that SnapMed provided to NL&F and by consulting the NCCI's Scopes Manuals for Department of Insurance-approved descriptions of the various classification codes. (*Id.* ¶¶ 34-35.) NL&F's actions in conducting the audits demonstrate that probable cause exists that a judgment will be rendered in its favor for the full $4,528,449.10 it seeks as a prejudgment remedy for the outstanding premiums. This is especially true given the "low standard" for probable cause and that NL&F need not establish its damages for SnapMed's breaches of contract with mathematical precision for purposes of a prejudgment remedy application. *SEI Fuel Servs., Inc.*, 2019 WL 6828431, at *2; *HSqd, LLC v. Morinville*, Docket No. 3:11-cv-1225, 2013 WL 1131590, at *2 (D. Conn. Mar. 18, 2013).

The Court should also grant NL&F a prejudgment remedy in the amount of $452,844.91 for prejudgment interest that has accrued since the premiums for the policies became due and payable. Conn. Gen. Stat. § 37-3a provides, in relevant part, that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable." "Prejudgment interest pursuant to § 37-3a has been applied to breach of contract claims for liquidated damages, namely, where a party claims that a specified sum under the terms of a contract, or a sum to be determined by the terms of the contract, owed to that party has been detained by another party." *Killion v. Davis*, 69 Conn. App. 366, 376 (2002). "Interest on such damages ordinarily begins to run from the time it is due and payable to the plaintiff." *Id.* at 375. "Prejudgment interest may be included in the calculation of a prejudgment remedy." *N. Jonas and Co., Inc. v. Brothers Pool Enterprises, Inc.*, Docket No. 3:22-cv-1097, 2022 WL 16630863, at *6 (D. Conn. Nov. 2, 2022).

Probable cause exists that the Court would award prejudgment interest in the amount of at least $452,844.91 should this action proceed to trial. NL&F notified SnapMed of the pending

audits for the 2020 Policy and 2021 Stub Policy in February 2021 and May 2021 respectively. (Aff. ¶¶ 25, 38.)  NL&F's auditors completed the revised audit for the 2021 Stub Policy in January 2022.  (*Id.* ¶ 44.)  NL&F determined that SnapMed owes NL&F a balance of $1,400,178.10 for this policy.  (*Id.* ¶ 45.)  To date, SnapMed has failed to remit any of this outstanding balance to NL&F, a year and a half after it became due and payable.  (*Id.* ¶ 46.)  Accordingly, there is probable cause that the Court would award NL&F at least one year's worth of prejudgment interest on the balance for the 2021 Stub Policy.

For the 2020 Policy, SnapMed failed to provide NL&F's auditors with the documents needed to complete the audit, forcing NL&F to resort to litigation.  (*Id.* ¶¶ 29, 31.)  Had SnapMed timely complied with the 2020 Policy audit, NL&F would have been able to calculate the final amount due and owing for that policy earlier, likely in 2021, or, at the latest, by early 2022. Although NL&F only was able to calculate the final premium for the 2020 Policy in June 2023, the Court should not reward SnapMed for breaching its contractual obligations by using this as the date when the premium for the 2020 Policy became due and payable.  It has been over two years since coverage under the 2020 Policy ceased.  And SnapMed dragged its feet and did not produce all of the documents NL&F needed to complete the audit on the 2020 Policy until nearly a year after NL&F commenced this action.  There thus is probable cause that the Court would award NL&F prejudgment interest for at least one year for SnapMed's breach of the 2020 Policy should this matter proceed to trial.

For the reasons explained above, there is probable cause that the Court would award NL&F at least one year's worth of prejudgment interest on the $4,528,449.10 outstanding balance for the

two policies.[3]  10 percent of $4,528,449.10 equals $452,844.91.  Accordingly, the Court should grant NL&F a prejudgment remedy in the amount of $4,981,294.01.[4]

### C. The Court Should Grant NL&F's Motion for Disclosure of Assets

Conn. Gen. Stat. § 52-278n(a) provides that the "court may, on motion of a party, order an appearing defendant to disclose property in which he has an interest or debts owing to him sufficient to satisfy a prejudgment remedy.  The existence, location and extent of the defendant's interest in such property or debts shall be subject to disclosure.  The form and terms of disclosure shall be determined by the court."  "Generally, under Connecticut law, a disclosure of assets is ordered if a prejudgment remedy is ordered." *Wachovia Bank, N.A. v. Cummings*, No. 3:09-cv-957, 2010 WL 466160, at *9 (D. Conn. Feb. 8, 2010).

As explained above, sufficient probable cause exists to warrant the issuance of a prejudgment remedy in this action.  Accordingly, the Court should grant NL&F's Motion for Disclosure of Assets.

## IV. CONCLUSION

For the foregoing reasons, NL&F respectfully requests that the Court grant its Application for Prejudgment Remedy and Motion for Disclosure of Assets.

---

[3] NL&F's request for a prejudgment remedy equal to one year's worth of prejudgment interest on the $4,528,449.10 balance that SnapMed owes is a conservative estimate, and made only for purposes of its Application.  Pursuant to the Court's Order on NL&F's Motion to Compel, motions for summary judgment must be filed by October 22, 2023. (ECF 52.)  Should this case not settle, it is probable that two years or more will have passed since the balance for both policies became due and owing.  It thus is entirely possible that a judgment over the $4,981,294.01 prejudgment remedy NL&F seeks would be rendered in NL&F's favor should this action proceed to trial.

[4] $4,528,449.10 (balance for premiums) + $452,844.91 (10 percent prejudgment interest for one year) = $4,981,294.01.

-13-

-14-

          **PLAINTIFF,**
          **NATIONAL LIABILITY & FIRE**
          **INSURANCE COMPANY**


By  _/s Daniel L. FitzMaurice_
    Daniel L. FitzMaurice (ct05331)
    Catherine A. DeLanzo (ct31323)
    Day Pitney LLP
    242 Trumbull Street
    Hartford, CT 06103
    (860) 275-0100
    (860) 275-0343 (fax)
    dlfitzmaurice@daypitney.com
    cdelanzo@daypitney.com

    *Attorneys for National Liability & Fire*
    *Insurance Company*

Case 3:22-cv-00780-OAW   Document 54   Filed 08/11/23   Page 15 of 15

-15-

## CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

                                                 */s/ Daniel L. FitzMaurice*
                                                 Daniel L. FitzMaurice